## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DONNELL WHITE (K64164), | ) | |
| | ) | |
| Petitioner, | ) | Case No. 20-cv-2432 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| SONJA NICKLAUS, | ) | |
| | ) | |
| Respondent. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Petitioner Donnell White, a prisoner at the Dixon Correctional Center, brings this *pro se* habeas corpus action challenging his convictions for aggravated discharge of a firearm, armed violence, unlawful use of a weapon by a felon, and aggravated unlawful use of a weapon from the Circuit Court of Cook County. *See* Petition for Writ of Habeas Corpus (Dckt. No. 1). The Court denies the petition on the merits and declines to issue a certificate of appealability.

### Background

The following facts come from the state court record, including the Illinois appellate court's opinions. *See* State Court Record (Dckt. No. 20). "A state court's factual findings are 'presumed to be correct' in a federal habeas corpus proceeding unless" the petitioner rebuts this presumption by clear and convincing evidence. *Carter v. Thompson*, 690 F.3d 837, 839 (7th Cir. 2012) (quoting 28 U.S.C. § 2254(e)(1)); *see also Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020). Petitioner did not set forth any evidence to rebut this presumption.

### I. Petitioner's Trial

On September 13, 2006, Donnell White was riding in a vehicle, and it was a wild ride. The vehicle was pursued by two Harvey police officers after he and the driver had been firing

guns out the windows of the car. *See People v. White*, 2011 IL App (1st) 092544-U, ¶¶ 3, 13 (2011) ("*Direct Appeal*"). During the police chase, White fired a .44-caliber revolver three times at the officers' vehicle. *Id.* at ¶ 3. Once the police stopped the car, the officers found a bag containing 2.1 grams of cocaine in White's possession. *Id.* White had a prior felony conviction for the manufacture or delivery of cannabis at the time of his arrest. *Id.*

White chose to have a jury trial, which took place over the course of three days. *See People v. White*, 2019 IL App (1st) 162490-U, ¶¶ 4-5 (2019) ("*Post-Conviction Petition Appeal*"). During jury selection on the first day of trial, White's counsel requested that the court pause the proceedings to allow him to "consult with [his] client" regarding a potential juror. *Id.* at ¶ 4. After speaking with White, counsel exercised a peremptory challenge. *Id.*

During the defense's case-in-chief, counsel indicated that White would not be testifying on his own behalf. *Id.* at ¶ 5. The trial court then asked White various questions about this choice, and Petitioner responded: "Yes," "Yes, sir," and "No, sir." *Id.* When asked if he made the decision not to testify after consulting with his lawyer, White responded, "Yes, sir." *Id.* The jury ultimately found White guilty of aggravated discharge of a firearm, armed violence, unlawful use of a weapon by a felon, and aggravated unlawful use of a weapon. *Id.*

Before White's sentencing, the probation office prepared a presentence investigation ("PSI") report and provided it to the trial court. *Id.* at ¶ 6; *see also* Presentence Investigation Report (Dckt. No. 20-11, at 77–84 of 220). According to the report, White was raised by his mother. *See* Presentence Investigation Report (Dckt. No. 20-11, at 81 of 220). He had a twenty-year relationship with his girlfriend Keturah Maynie. *Id.* Together they had two children, and White helped Maynie raise her other son. *Id.*

2

White had worked at Universal Cleaning Service (Maynie's father's cleaning service) for thirteen years. *Id.* In addition to his paycheck, White received Social Security payments every month. *Id.* at 83. White also stated he helped Maynie pay the bills, including a $1,200 electric bill. *Id.*

The PSI also listed Petitioner's criminal history. He had juvenile adjudications for possession of a controlled substance and aggravated battery. *Id.* at 79. And he had adult convictions for drug possession and delivery, and for driving on a suspended or revoked driver's license. *Id.* at 79–80.

In the Health History section of the report, White indicated that he sustained a gunshot wound to the head when he was fifteen years old and suffered from seizures, blackouts, and migraine headaches. *Id.* at 82. He explained that he was prescribed medication, but did not like how it made him feel. *Id.* White also asserted that he was diagnosed with schizophrenia and had been seeing a doctor for the past couple of years, but could not remember the doctor's name. *Id.* The doctor prescribed him medicine for his schizophrenia, but had not been taking it because it made him feel weird. *Id.* White otherwise described his mental health as "good." *Id.*

The PSI's summary stated that Petitioner was diagnosed as schizophrenic but had not taken his medication in the prior month. *Id.* at 83. It appears that this information came solely from White's statements during his interview with the probation officer. There is nothing in the report that indicates that the probation officer confirmed White's mental health claims through an independent source, such as a medical record.

At sentencing, the trial court paused the proceedings to address White's schizophrenia diagnosis and White's comment that he did not take his prescribed medication. *See Post-*

3

*Conviction Petition Appeal*, at ¶ 7.  The trial court expressed surprised at the diagnosis, stating: "I will note, for the record, that Mr. White has been in front of me for about the last year and a half.  I have never noticed any unusual behavior by Mr. White, nothing out of the ordinary."  *Id.*; *see also* Sentencing Tr. (Dckt. No. 20-11, at 185 of 220).

Petitioner confirmed to the trial court that he had been prescribed medication, but was not currently taking it and could not identify the name of the medication or who prescribed it to him. *See* Sentencing Tr. at 185-86.  Instead, he deferred to his mother who informed the court that Petitioner was prescribed Haldol and Cogentin.[1]  *Id.* at 186.

The trial court *sua sponte* ordered a behavioral clinical examination ("BCX") to determine whether White was fit for sentencing, and White's counsel requested the examination to determine if White was fit at the time of trial, too.  *Id.* at 186–87.  So, a psychiatrist with Forensic Clinical Services completed the BCX.  *See* Psychiatric Summary (Dckt. No. 20-11, at 191–96).  The psychiatrist reviewed various records, including medical records and trial transcripts, and conducted a clinical interview with White.  *See Post-Conviction Petition Appeal*, at ¶ 8.

During the two-hour interview, White correctly stated his age, but provided the wrong year for his date of birth after thinking about it for some time.  *See* Psychiatric Summary (Dckt. No. 20-11, at 191 of 220).  Contrary to the PSI, Petitioner denied ever working before his arrest, explaining that he only left his home to go outside and to go to his mother's house.  *Id.* at 192.

---

[1]  Haldol is the brand name of Haloperidol, a medication prescribed to treat schizophrenia.  *See Haloperidol*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/haloperidol-oral-route/description/drg-20064173 (last visited Sept. 18, 2022).  Cogentin is the brand name of Benztropine, a medication used to improve muscle control.  *See Benztropine*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/benztropine-oral-route/description/drg-20072652 (last visited Sept. 18, 2022).

4

He also denied knowing how much he paid for rent or how much his bills were, stating that Maynie took care of it. *Id.*

With respect to his mental health, White reported that he stopped taking his medication when he started using drugs and alcohol. *Id.* He admitted to smoking and drinking "a lot," and explained that he would take any type of drug given to him. *Id.*

White also reported a history of auditory hallucinations consisting of a voice in his head telling him to do drugs. *Id.* The psychiatrist noted that White's report of a single voice was inconsistent with a previous report, where Petitioner stated that he heard multiple voices. *Id.* at 194. White also told the psychiatrist that he was hospitalized at two different facilities for psychiatric purposes, but neither facility had any record of him being treated there. *Id.* at 195.

The examiner stated there was no evidence that White had received any psychiatric treatment or had been prescribed any medication in the six years before trial. *Id.* White was not prescribed any medication or psychiatric services after getting into custody, either. *Id.* The examiner also stated that it wasn't clear whether White was ever prescribed any medications, or if he ever needed medication. *Id.*

When asked about the case, White stated that "he went to trial for 'something they said I done. I really don't remember.'" *Id.* at 193. When asked about the jury's verdict, he responded, "the who?" *Id.* He could not remember whether the jury found him guilty or not guilty. *Id.* White also couldn't remember how many witnesses testified and said that he did not know what it meant for someone to testify against him. *Id.* He did not know the name of the judge, but did remember the name of his lawyer. *Id.*

Despite White's recall issues during the BCX, the psychiatrist noted that White didn't have any issues providing information to the probation officer who completed his PSI report. *Id.* at 194. And the probation officer confirmed that if White had responded to a question stating he did not know, could not remember, or to ask his mother, the probation officer would have noted that in the report. *Id.* The BCX also noted that White was out on bond for a substantial period of time after his convictions and always appeared in court and had no prior bond forfeitures. *Id.* at 191.

Overall, the psychiatrist described Petitioner as alert and oriented. *Id.* at 193. His speech was coherent, and he did not exhibit any latency in his responses "except when appearing to search for an answer or intending to present as being unable to do so." *Id.* "At no time [during the evaluation] did [White] appear to be responding to internal stimuli." *Id.* at 193–94. And he did not display any form of thought disorder. *Id.* at 194.

In sum, the psychiatrist diagnosed White with malingering, which is a falsification or exaggeration of illness to gain a benefit. *Id.* This diagnosis was consistent with three prior forensic psychiatric examinations conducted just a few months after White's trial. *Id.* at 195. The other forensic psychiatric examinations also found that White was malingering. *Id.*

The BCX also diagnosed White with having a reported history of polysubstance abuse and psychotic disorder, and a provisional diagnosis of a personality disorder. *Id.* Her diagnosis also included a notation about White's gunshot wound and bifrontal craniotomy. *Id.* Based on the records and her clinical examination, the psychiatrist opined, to a reasonable degree of medical and psychiatric certainty, that White had been mentally fit to stand trial. *Id.* at 196.

6

After the BCX, the trial court presided over another hearing. The trial court did not find any *bona fide* issues of fitness. *See Post-Conviction Petition Appeal*, at ¶ 14. Defense counsel protested the court's finding and requested a short continuance to speak with White about how he wished to proceed. *Id.*

The parties returned to court a few days later, and defense counsel indicated that White had decided to continue with sentencing. *Id.* at ¶ 15. White confirmed this decision to the court. *Id.* ("Counsel asked defendant if that was correct, and defendant answered, 'Yes.'").

During the sentencing hearing, the State made arguments about aggravation, highlighting the facts of the case and White's criminal history as set forth in the PSI. *Id.* at ¶ 16. Maynie also testified on behalf of White and described him as a "good family man." *See Direct Appeal*, at ¶ 10. She discussed White's gunshot wound, explaining that he became "a little more quiet, and sometimes a little more hyper" after the injury. *See Post-Conviction Petition Appeal*, at ¶ 17. White also "spoke at length in allocution, apologizing for 'what happened', insisting that he had never been a bad person in life and would not hurt anyone, stating that everyone makes wrong decisions that make one a better person, relating how he had raised three children, detailing his work habits, and asking for forgiveness." *Id.*

The trial court remarked that it had "no doubt that [White was] probably a good father," and noted the absence of violence in his background. *See Direct Appeal*, at ¶ 13. However, the trial court went on to say that White picked a "doozie of a time to show [his] violent background, shooting at two people that [he] knew to be police officers." *Id.* While White said he would never hurt anybody, the fact that he was firing a .44 handgun at someone suggested otherwise.

*Id.* He was not acting like a good parent that day, "probably because [he] got caught up in [] drug wealth." *Id.*

"[B]ased on the factors . . . hear[d] in aggravation and mitigation, review[] [of] the pre-sentence investigation and the arguments of the attorneys," the trial court sentenced Petitioner to concurrent terms of 25 years for aggravated discharge of a firearm, 25 years for armed violence, 10 years for unlawful use of a weapon by a felon, and 3 years for aggravated unlawful use of a weapon. *Id.* at ¶¶ 2, 14.

## II.    Petitioner's Direct Appeal

White appealed his 25-year sentence for aggravated discharge of a firearm, and his 25-year sentence for armed violence, as excessive. *See Direct Appeal*, at ¶ 2. He argued that the trial court had failed to adequately weigh certain mitigating factors, and had considered improper aggravating factors during the sentencing hearing. *Id.*; *see also* Brief & Argument for Defendant-Appellant (Dckt. No. 20-2, at 1–32 of 42). The state appellate court rejected White's arguments and affirmed his convictions. *See Direct Appeal*, at ¶ 26.

White presented the same arguments to the Illinois Supreme Court in his Petition for Leave to Appeal. *See* Petition for Leave to Appeal (Dckt. No. 20-5, at 1–22 of 36). The Illinois Supreme Court denied White's petition. *See People v. White*, 962 N.E.2d 488 (2011).

## III.    Petitioner's Post-Conviction Petition Proceedings

In collateral proceedings, White filed a *pro se* post-conviction petition alleging that he received ineffective assistance from his trial counsel for his failure to request a fitness hearing before trial. *See* Petition for Post-Conviction Relief (Dckt. No. 20-11, at 116–24 of 220). White attached affidavits from his mother and Maynie (again, his girlfriend) in support of his petition.

8

*See* Bobbie White Aff. (Dckt. No. 20-11, at 126–28 of 220); Keturah Maynie Aff. (Dckt. No. 20-11, at 129–32 of 220). White's appointed counsel then filed an amended petition restating White's claim and incorporating the allegations set forth in White's *pro se* petition and the supporting affidavits. *See* Am. Petition for Post-Conviction Relief (Dckt. No. 20-11, at 163–67 of 220).

In her affidavit, White's mother stated that he began displaying erratic behavior after he was shot in the head as a teenager, and that she took him to see many psychologists over the years to try and get him help. *See* Bobbie White Aff. (Dckt. No. 20-11, at 127 of 220). According to his mother, White was diagnosed with schizophrenia in the mid-1990s, with his last diagnosis in 2002. *Id.* She claimed that he was prescribed Olanzine,[2] which she encouraged him to take to control the voices in his head. *Id.*

According to his mother, White stopped taking his medication two years before his trial and started wandering the streets as a result. *Id.* She claimed that on the night before trial, she and Maynie drove around town to find White. *Id.* Once they found him, his mother gave White a couple of her pills, Haldol and Cogentin, to help subdue him for court. *Id.*

White's mother explained that she also suffers from schizophrenia, and that the Haldol and Cogentin that she had given him were her *own* pills, not pills prescribed to White. *Id.* That statement in her affidavit sat uncomfortably with her statement to the trial court. When discussing his mental health at sentencing, White's mother told the trial court that *White* was prescribed Haldol and Cogentin. *See* Sentencing Tr. (Dckt. No. 20-11, at 186 of 220).

---

[2] Petitioner's mother maybe referring to Olanzapine, a medication used to treat schizophrenia. *See Olanzapine*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/olanzapine-oral-route/description/drg-20071350 (last visited Sept. 18, 2022).

Strictly speaking, the statement that White was prescribed Haldol and Cogentin may not necessarily be inconsistent with the notion that White's mother gave him her pills (not his pills). Both could be true: White could have been prescribed Haldol and Cogentin, *and* White's mother could have given White *her* Haldol and Cogentin. Maybe they both had that prescription.

Even so, that reading may not be the most natural takeaway of the testimony at the sentencing. She didn't say anything about giving White her medicine at sentencing. She only talked about him receiving medicine from his doctor, and said nothing about him getting any medication from her own personal supply.

White's mother claimed that the pills that she gave to White immediately before trial affected his ability to understand simple conversations. *See* Bobbie White Aff. (Dckt. No. 20-11, at 127 of 220). Together with Maynie, White's mother claims that she told his counsel about the incident on the morning of trial. *Id.* at 128. According to his mother, counsel reportedly said that he would discuss it with the judge, he never did. *Id.*

White's mother stated that if counsel had spoken to the judge about White's mental illness, the judge would have ordered a psychological evaluation before trial. *Id.*

Maynie attested to the same incident in her affidavit, claiming that White was not cognizant of his upcoming trial and was hearing voices on the day of trial and the day before. *See* Keturah Maynie Aff. (Dckt. No. 20-11, at 130 of 220). She also alleged it was difficult to converse with White after he took his mother's pills because his questions were "quite infantile in nature." *Id.*

The trial court dismissed the post-conviction petition in second-stage proceedings following a hearing on the State's motion to dismiss. *See Post-Conviction Petition Appeal*, at ¶¶ 27-28. The appellate court affirmed the trial court's dismissal on appeal. *Id.* at ¶ 37.

Petitioner raised the same argument about ineffective assistance of counsel in his *pro se* post-conviction Petition for Leave to Appeal. *See* Petition for Leave to Appeal (Dckt. No. 20-10). The Illinois Supreme Court denied that petition. *See People v. White*, 132 N.E.3d 343 (2019).

## IV.    Federal Habeas Corpus Petition

White later filed a timely *pro se* habeas corpus petition. *See* Petition for Writ of Habeas Corpus (Dckt. No. 1). He asserts two grounds for relief. White's first claim is that he received ineffective assistance of trial counsel when trial counsel failed to request a fitness hearing before trial. Second, he claims that he received excessive sentences in violation of the Eighth Amendment because the trial court (a) failed to adequately weigh certain mitigating factors during sentencing, and (b) considered improper matters of aggravation.

## Legal Standard

Before considering a habeas corpus petition on the merits, a district court must first determine "whether the petitioner exhausted all available state remedies and whether the petitioner raised all his claims during the course of the state proceedings." *Verdin v. O'Leary*, 972 F.2d 1467, 1472 (7th Cir. 1992) (citation omitted). Failure to meet either requirement can bar a claim. *Henderson v. Thieret*, 859 F.2d 492, 496 (7th Cir. 1988). In both inquiries, the critical question is whether the petitioner fairly presented the federal issue to the state courts for one complete round of review. *Verdin*, 972 F.2d at 1472–73; *Hicks v. Hepp*, 871 F.3d 513, 530

11

(7th Cir. 2017). A claim in a habeas corpus petition can also be procedurally defaulted, and thus barred from review, if the state court's decision about the claim rests on an adequate and independent state procedural ground. *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010).

Only after a claim overcomes these procedural hurdles can a district court evaluate its merits. A federal court can issue a writ of habeas corpus only if: (1) the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(1)-(2).

A state court decision that is "contrary to" Supreme Court precedent is one that "applies a legal standard inconsistent with governing Supreme Court precedent or contradicts the Supreme Court's treatment of a materially identical set of facts." *Rodriguez v. Gossett*, 842 F.3d 531, 537 (7th Cir. 2016) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). In contrast, an "unreasonable application" of clearly established federal law occurs when the state court "identifies the correct legal rule but applies it in a way that is objectively unreasonable." *Id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003)).

Ultimately, this framework is a "highly deferential standard for evaluating state-court rulings" that is "difficult to meet" and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (cleaned up).

## Analysis

White makes two basic arguments. First, he claims that he received ineffective assistance of trial counsel when trial counsel failed to request a fitness hearing before trial. Second, he

12

claims that his sentences were excessive in violation of the Eighth Amendment. When challenging the length of the sentence, he argues that the trial court failed to adequately weigh certain mitigating factors during sentencing, and considered improper matters of aggravation.

The Court will consider each argument in turn.

## I.    Ineffective Assistance of Counsel

White first claims that he received ineffective assistance of counsel because his lawyer failed to request a fitness hearing before trial.

As an initial matter, White cleared the procedural hurdles for this claim. He exhausted all of his available state remedies through his direct appeal and post-conviction petition proceedings, and he raised his ineffective assistance of counsel claim during the course of those proceedings. So, the Court turns to the merits.

White argues that "defense counsel knew of [White's] [q]uestionable mental condition before trial, but did nothing to alert the Judge or examining Psychiatrist of his concerns." *See* Petition for Writ of Habeas Corpus, at 6 (Dckt. No. 1). To support this argument, White points to his prescription for psychotropic medication, the affidavits of his mother and girlfriend, trial counsel's remarks, and the "disturbing findings" in the psychiatrist's BCX report. *Id.* at 8.

This Court's focus is the Illinois Appellate Court's decision on White's post-conviction petition. After all, a federal court can only issue a writ of habeas corpus if the *state court's* decision was contrary to clearly established law or based on an unreasonable determination. *See* 28 U.S.C. § 2254(d)(1)-(2). And the Illinois Appellate Court in *People v. White*, 2019 IL App (1st) 162490-U (2019), is the last state court to review White's ineffective assistance of counsel

claim on the merits. *See Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citing *Greene v. Fisher*, 565 U.S. 34, 40 (2011); *Garth v. Davis,* 470 F.3d 702, 710 (7th Cir. 2006)).

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), provides the standard for claims of ineffective assistance of counsel. The Illinois Appellate Court correctly identified this standard, stating that "[t]o establish ineffective assistance of counsel under *Strickland*, a defendant must show (1) that his counsel's representation fell below an objective standard of reasonableness; and (2) but for counsel's errors, there is an reasonable probability that the result of the trial would have been different." *See People v. White*, 2019 IL App (1st) 162490-U, at ¶ 32 (2019) (citing *Strickland*, 466 U.S. at 687). In other words, White must establish "both deficient performance and prejudice." *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).

When an ineffective assistance of counsel claim involves an attorney's failure to request a competency hearing, the relevant inquiry under *Strickland*'s prejudice prong is "whether there is a reasonable probability [White] would have been found unfit had a hearing been held." *See Warren v. Baenen*, 712 F.3d 1090, 1100 (7th Cir. 2013) (citing *Burt v. Uchtman*, 422 F.3d 557, 567 (7th Cir. 2005) (citations omitted)). The test of competency is not an issue of mental illness, "but whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and "whether he has a rational as well as factual understanding of the proceedings against him." *Id.*; *see also Dusky v. United States*, 362 U.S. 402, 403 (1960). "Relevant factors include any evidence of irrational behavior, the defendant's demeanor in court, and any medical opinions on the defendant's competency to stand trial." *Sturgeon v. Chandler*, 552 F.3d 604, 612 (7th Cir. 2009).

14

White cannot demonstrate that the appellate court's rejection of his ineffective assistance claim was contrary to, or an unreasonable application of, *Strickland*.

The state court correctly set forth *Strickland*'s two-prong test. And the state court properly decided that White could not establish sufficient prejudice resulting from counsel's failure to request a competency hearing before trial.[3] *See Post-Conviction Petition Appeal*, ¶¶ 32-37. So, White cannot establish the state court decision was "contrary to" *Strickland*.

Additionally, the state court ruling was not an unreasonable application of *Strickland* or predicated upon an unreasonable determination of facts. The state court reasonably relied on both the psychiatrist's findings in the BCX and Petitioner's demeanor during trial in reaching its conclusion. *Id.* at ¶ 37. Contrary to Petitioner's argument, the appellate court did not find the psychiatrist's findings, such as his inability to remember his birth year, "disturbing." Rather, the appellate court found that these factors informed the psychiatrist's diagnosis that Petitioner was malingering. *Id.* at ¶ 36. Accordingly, the court found there was no reasonable probability that White would have been found unfit had his counsel requested a fitness hearing before trial. *Id.* at ¶ 37.

The record does not include any evidence of irrational behavior outside of the allegations set forth in the affidavits of White's mother and girlfriend. Those allegations, however, are undermined by the abilities displayed by White at trial, in the presence of the trial court. White was able to consult with his counsel during jury selection in the exercise of a peremptory strike. He was able to appropriately respond to the trial court when questioned about his decision not to

---

[3] As the Supreme Court explained in *Strickland*, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *See Strickland v.* Washington, 466 U.S. 668, 697 (1984).

testify. And he was able to provide a lengthy statement in allocution at sentencing where White described his family and work history, and expressed remorse for his offenses.

Also, White's girlfriend did not mention any of the erratic behaviors alleged in her affidavit when the court asked her about White's behavior following his gunshot wound injury during her testimony at the sentencing hearing.

Beyond the absence of any unusual behavior at trial, the records reviewed by the psychiatrist indicated that Petitioner was not receiving any psychiatric treatment at the time of trial, and had not been prescribed medication for several years. According to his mother's affidavit, the medication that White's mother gave him was hers, not his.

Further, White readily provided information to the probation officer for purposes of the PSI. He described his 13-year employment history, the amount of income he received from his employment and from Social Security, and the amount of his electric bill. Only later, once he was being evaluated for the BCX, did White deny being able to work and reported no knowledge of his finances.

The results of the BCX, which found that White was mentally able to stand trial at the time of trial, were supported by three other psychological evaluations. They concluded that Petitioner had malingering memory impairment.

On top of it all, the trial court spent time with White, over an extended period of time. The trial court stated: "I will note, for the record, that Mr. White has been in front of me for about the last year and a half. I have never noticed any unusual behavior by Mr. White, nothing out of the ordinary." *See Post-Conviction Petition Appeal*, at ¶ 7; *see also* Sentencing Tr. (Dckt. No. 20-11, at 185 of 220).

16

Based on that statement by the trial judge, it is hard to see how the failure of White's counsel to raise the issue caused White to suffer any prejudice. This Court fails to see any "reasonable probability [White] would have been found unfit had a hearing been held." *See Warren*, 712 F.3d at 1100. The trial court saw White first hand, and believed that White could stand trial.

The Court acknowledges the claim in his mother and girlfriend's affidavits that White is schizophrenic. But there is no evidence in the record to support that assertion. There were no medical records before the state court demonstrating that White was ever diagnosed with a mental illness or prescribed medication by a doctor. White's demeanor at trial was consistent with a person who was not suffering from a mental illness. There were no outbursts, and the trial court saw no behavior that raised a judicial eyebrow. And on top of it all, the medical experts examined Petitioner and opined he is a malinger.

As a result, the state appellate court's rejection of Petitioner's ineffective assistance claim is not contrary to, and is not an unreasonable application of, *Strickland*.[4]

---

[4] Although occurring post-trial, the Court also notes that Petitioner filed a variety of *pro se* motions and petitions without assistance. He filed a *pro se* petition for post-conviction relief, which his counsel incorporated into his amended petition, a *pro se* motion for order nunc pro tunc to correct the mittimus, Motion for Order Nunc Pro Tunc Correcting the Mittimus (Dckt. No. 20-11, at 153–156 of 220), a *pro se* post-conviction Petition for Leave to Appeal, and the *instant pro se* habeas corpus petition, Petition for Writ of Habeas Corpus (Dckt. No. 1). He also wrote letters to the clerk of the Circuit Court of Cook County to follow up on the status of his motion for order nunc pro tunc. *See* Letters to Clerk (Dckt. No. 20-11, at 216–218 of 220). Petitioner's filings and correspondence demonstrate an advanced understanding of the legal process and lends further support to a finding of competency. *See Warren v. Baenen*, 712 F.3d 1090, 1100 (7th Cir. 2013) (explaining petitioner's letters written after his plea wherein he requested new counsel and that he be allowed to change his plea evidenced a "rational as well as factual understanding of the proceedings" in its analysis of petitioner's ineffective assistance claim for the failure to request a pre-plea competency hearing) (quotations marks and citations omitted)).

**II.      Eighth Amendment**

Next, White claims that he received excessive sentences in violation of the Eighth Amendment.  He received concurrent sentences of 25 years.

He argues that the excessive sentencing resulted from the trial court's failure to properly consider his family background, work history, upbringing, mental health, and non-violent character as mitigating factors.  *See* Writ of Habeas Corpus, at 6 (Dckt. No. 1).  Petitioner also raises a secondary argument that the trial court improperly considered circumstances of the crime as factors in aggravation of his sentence.  *Id.*

Unlike the claim about the ineffective assistance of counsel, this claim is new.  White failed to clear the procedural hurdles, so he can't raise it here and now.

State prisoners must give state courts a full and fair opportunity to resolve their federal constitutional claims before seeking federal habeas relief.  *See O'Sullivan v. Boerckel*, 526 U.S 828, 845 (1999); *Rose v. Lundy*, 455 U.S. 509, 518 (1982).  This obligation requires fair presentment of both the operative facts and controlling legal principles of each claim through one full round of state court review, including a Petition for Leave to Appeal before the Illinois Supreme Court.  *Id.* at 847-48; *Weaver v. Nicholson*, 892 F.3d 878, 886 (7th Cir. 2018); *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009); *Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004).

Courts consider the following factors when determining whether a petitioner fairly presented his claim in the state court system:  "(1) whether the petitioner relied on federal cases that engage in constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so

18

particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation" *Sweeney*, 361 F.3d at 332 (quoting *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001)).

But White's habeas corpus petition is the first time that he frames his sentencing claim as an Eighth Amendment issue. On direct appeal, he argued that his sentencing contravened the Unified Code of Corrections codified by Illinois statute, 730 ILCS 5/1-1-2. He also argued that it violated an Illinois constitutional mandate that requires the court to balance the retributive and rehabilitative purposes of punishment when sentencing offenders. *See* ILL. CONST. art. I, § 11; *see also People v. Center,* 198 Ill. App. 3d 1025, 145 Ill. Dec. 106, 556 N.E.2d 724, 729 (1990). *See People v. White*, 2011 IL App (1st) 092544-U, ¶ 2 (2011).

White's briefs in state court did not invoke the Eighth Amendment, and did not cite to federal or state cases that discuss the trial court's sentencing in the context of the Eighth Amendment. *See* Brief & Argument for Defendant-Appellant (Dckt. No. 20-2); Brief & Argument for Plaintiff-Appellee (Dckt. No. 20-3); Reply Brief & Argument for Defendant-Appellant (Dckt. No. 20-4). White's Petition for Leave to Appeal didn't mention the Eighth Amendment, either. *See* Petition for Leave to Appeal (Dckt. No. 20-5, at 1–22 of 36).

Instead, White presented the Illinois courts with a challenge to the trial court's application of aggravating and mitigating factors under state sentencing rules. He did not make a federal constitutional claim about his sentence. White failed to exhaust his Eighth Amendment claim through one full round of state court review, so his Eighth Amendment excessive sentence claim is procedurally defaulted.

A procedurally defaulted claim is barred from federal habeas review unless White can establish "cause for the default and actual prejudice as a result of the alleged violation of federal law," or "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also House v. Bell*, 547 U.S. 518, 536 (2006).

White did not argue that either exception applies in his habeas corpus petition. And he didn't file a reply brief to address Respondent's procedural default argument, either. *See* Resp. (Dckt. No. 18). So, White waived the argument that he can excuse his default of his Eighth Amendment claim. *See Winsett v. Washington*, 130 F.3d 269, 273 (7th Cir. 1997) ("Normally, a party waives those issues it fails to raise in the district court.") (citations omitted)).[5]

## III. Certificate of Appealability and Notice of Appeal Rights

The Court declines to issue a certificate of appealability. A certificate of appealability "may not issue 'unless the applicant has made a substantial showing of the denial of a

---

[5] Beyond the waiver, the record does not demonstrate grounds to excuse the procedural default. There is no evidence White's efforts to raise the *instant* claim were impeded by some objective, external factor, such as interference by officials, ineffective assistance of counsel, or an unavailable factual or legal basis, that would constitute cause to excuse the default. *See Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013); *see also Guest v. McCann*, 474 U.S. 926, 930 (7th Cir. 2007). Even if White's counsel was ineffective in failing to frame the claim in the context of the Eighth Amendment, an ineffective assistance of counsel claim itself must be properly preserved in the state courts. *See Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). White did not present an ineffective assistance of counsel argument about the underlying sentencing claim in state court proceedings.

With respect to the fundamental miscarriage of justice exception, there is no dispute that White was a passenger in a vehicle being pursued by police when he fired a gun three times at the officers' vehicle and was subsequently arrested at the scene with cocaine in his possession. *See Direct Appeal*, at ¶ 3. At his sentencing hearing, White expressed remorse for committing the crimes for which he was convicted, explaining, "I just want to say I'm – I'm sorry about what happened. . . . And I realize the decisions I made in life were not the right decisions. But I just wanted to say that what happened, I'm sorry. They know I wouldn't hurt them." *Id.* at ¶ 11. The record does not support a claim of actual innocence to implicate the fundamental miscarriage of justice exception. *See McQuiggins v. Perkins*, 569 U.S. 383, 386-87 (2013) (explaining the standard to establish actual innocence is "demanding" and "seldom met," and requires a petitioner to persuade "the district court that, in light of [] new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.") (quotation marks and citations omitted)).

constitutional right.'" *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (quoting 28 U.S.C.

§ 2253(c)).  This standard means that White must demonstrate that reasonable jurists could

debate whether this Court should have resolved Petitioner's claims differently, or that the issues

were "adequate to deserve encouragement to proceed further."  *See Arredondo v. Huibregtse*,

542 F.3d 1155, 1165 (7th Cir. 2008) (citing *Slack*, 529 U.S. at 484).  White cannot meet this

standard.

   White is advised that this is a final decision ending his case in this Court.  If White

wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of

judgment.  *See* Fed. R. App. P. 4(a)(1).  White need not bring a motion to reconsider this Court's

ruling to preserve his appellate rights.  However, if White wishes the Court to reconsider its

judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b).  Any Rule

59(e) motion must be filed within 28 days of the entry of this judgment.  *See* Fed. R. Civ. P.

59(e).  The time to file a motion pursuant to Rule 59(e) cannot be extended.  *See* Fed. R. Civ. P.

6(b)(2).  A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule

59(e) motion is ruled upon.  *See* Fed. R. App. P. 4(a)(4)(A)(iv).  Any Rule 60(b) motion must be

filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed

no more than one year after entry of the judgment or order.  *See* Fed. R. Civ. P. 60(c)(1).  The

time to file a Rule 60(b) motion cannot be extended.  *See* Fed. R. Civ. P. 6(b)(2).  A Rule 60(b)

motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only

if the motion is filed within 28 days of the entry of judgment.  *See* Fed. R. App. P. 4(a)(4)(A)(vi).

**Conclusion**

White's habeas corpus petition (Dckt. No. 1) is denied on the merits. Any other pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) terminate Respondent Sonja Nicklaus, and replace her with Petitioner's current custodian, Tarry Williams, Warden, Dixon Correctional Center; (2) alter the case caption to *White v. Williams*; and (3) enter a judgment in favor of Respondent and against Petitioner.

Date: September 18, 2022

Steven C. Seeger
United States District Judge